[Cite as *Adae v. Univ. of Cincinnati*, 2012-Ohio-3855.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

CYNTHIA A. ADAE, et al.

    Plaintiffs

    v.

UNIVERSITY OF CINCINNATI, et al.

    Defendants

Case No. 2007-08228

Judge Alan C. Travis

<u>DECISION</u>

{¶ 1} Plaintiffs brought this action alleging medical negligence and loss of consortium. The issues of liability and damages were bifurcated. After a trial on the issue of liability, the court rendered judgment in favor of plaintiffs. The case then proceeded to trial on the issue of damages.

{¶ 2} As an initial matter, regarding the deposition transcript of Jeffrey Strakowski, M.D., which was admitted into evidence as Defendants' Exhibit N, all evidentiary objections set forth therein are OVERRULED.

{¶ 3} Plaintiffs alleged that Jennifer Bain, M.D., an employee of defendant University of Cincinnati, was negligent in failing to timely diagnose and treat the spinal epidural abscess suffered by plaintiff Cynthia "Cindy" A. Adae, and that such failure resulted in her sustaining permanent neurological deficits. After trying the issue of liability, the court concluded that Dr. Bain deviated from the standard of care in failing to investigate the symptoms associated with Cindy's condition and that Bain's negligence

was the sole proximate cause of Cindy's outcome. Judgment was entered in favor of plaintiffs in an amount to be determined at the trial on the issue of damages.

{¶ 4} At the damages trial, Cindy and her husband of 33 years, plaintiff Howard "Rau" Adae, Jr., testified as to the nature of Cindy's condition subsequent to the spinal injury and how it has affected them. According to Cindy, she has no function in her right foot, little function in her right leg, "pretty good" function in her left leg, weak grip strength in her hands, she requires catheterizing four or five times a day in order to pass urine, and she requires digital stimulation of the bowel once or twice a day in order to pass stool. She noted that she also suffers from occasional muscle spasms in her legs, and that she takes medication to subdue them when they occur, but that Rau is able to stop them immediately by applying pressure to her legs. She wears an orthotic brace on her right foot and ankle which allows her to perform therapeutic walking for a short time each day, but she is otherwise wheelchair-bound. Notwithstanding her neurological deficits, Cindy stated that she believes her health is good overall. Though she was diagnosed with type-1 diabetes as a child, she related that this condition has remained under control for several years, and she noted that she has a family history of individuals living to their 80s and 90s.

{¶ 5} Cindy stated that she sleeps in a hospital bed in the first-floor living room of the family's two-story home. Rau testified that at 7:00 a.m. each morning, he assists Cindy in getting from the bed to her bedside commode chair. Cindy related that she wears diapers in order to capture urine that leaks once her bladder has filled, and that the diapers often become soaked overnight, especially during the periods in which she takes Lasix, a water pill, to control the bodily swelling that she has suffered on and off since her injury. Rau stated that when leaks occur, he puts on surgical gloves to clean and sanitize the affected area, lubricates and inserts a catheter to drain the bladder, and then removes the catheter and sanitizes the area once more. Cindy stated that she is unable to catheterize herself.

{¶ 6} Rau testified that on most mornings, he gives Cindy a sponge bath, then retrieves her clothes and provides some assistance as she dresses. Cindy stated that she is capable of dressing herself for the most part, but that it requires a great deal of effort and she tires quickly, particularly when it comes to putting on pants, which takes

several minutes and requires her to rock side to side in her bed. After she is dressed, Cindy then performs exercises in bed, and Rau stated that he assists her with range of motion exercises by raising her legs and bending her knees. When this is done, Rau puts Cindy's orthotic device on her right foot and ankle, which she stated that she cannot do herself, and he then prepares breakfast and gives Cindy her medications. Cindy related that they both prepared meals before her injury, but that she is unable to do so now inasmuch as their kitchen lacks wheelchair accommodations. Rau also related that Cindy can administer her own medications, including the insulin injections she takes four times each day for her diabetes, but that he usually administers the first and last injections because she is fatigued at those times.

{¶ 7} Rau stated that after finishing breakfast at about 8:00 a.m., he leaves the house to work on the family farm, where they raise fruit, field crops, and cattle, and from late May through the autumn, they operate a retail farm market open to the public. Rau stated that Cindy worked on the farm with him since 1978, and that before her injury she performed all manner of jobs, such as bailing hay and pruning trees in the apple orchard; she also managed the sales room when it was open, including supervising the part-time seasonal employees. Rau recalled that he and Cindy used to both work on the farm from about 8:00 a.m. until dusk, year round.

{¶ 8} Cindy explained that after her injury, her role on the farm has been limited to working a few hours a day when the sales room is open, where she answers telephones, converses with customers, and supervises the seasonal employees. Rau stated that Cindy's inability to perform the work that she used to do on the farm has hurt the business in that much of the work, such as pruning, is not being done, and that this has had a negative effect on the quality of the produce. He stated that he cannot afford to hire someone to perform all the work that she used to do, and that it is difficult to find employees who will work under the tough hours and conditions.

{¶ 9} Rau testified that on the days when Cindy can work in the sales room, he drives her there in a golf cart at about 8:00 a.m., when he leaves the house for work; otherwise, Cindy stays in the house and can contact him by mobile phone if she needs assistance, typically after a bladder or bowel accident. Rau stated that at 10:00 a.m., he takes a short break to check on Cindy and assist her with a therapeutic standing

exercise, which requires removal of her orthotic brace and getting out of her wheelchair. Rau further stated that he takes a lunch break at noon, at which time he helps Cindy onto her commode chair so that he can help empty her bowel, which he does by laying on the floor, putting on a lubricated glove, and inserting a finger into the rectum to digitally stimulate the bowel until a movement occurs, which may take up to ten minutes. Cindy stated that she is unable to perform this task on her own. Rau stated that he then prepares lunch, and when they are finished, he puts Cindy's orthotic brace back on so that she can use a walker to therapeutically ambulate for a few minutes around the first floor of the home.

{¶ 10} According to Rau, he returns to work around 1:30 p.m., and during the sales season he drives Cindy back to the sales room via golf cart, but outside the sales season she remains in the house. He stated that he takes a short break at 3:00 p.m. to check on her if she is in the house, and that at 5:00 p.m., he returns to catheterize her bladder. He explained that on most evenings, he pushes her wheelchair outdoors and around the house to the walk-in basement doors so that she can access a shower stall that he constructed for her there; he related that the original shower is on the second floor. He noted that during inclement weather, in lieu of going outdoors to access the basement, he helps her scoot down the stairs. Cindy stated that she is unable to transfer herself into the shower and requires assistance. According to Rau, when Cindy is finished, he helps her put on her put on pajamas and then wheels her outside and back to the first floor, where they have a supper that he prepares. Rau stated that Cindy gets tired much more easily than she used to, usually retiring to bed around 7:30 p.m., at which time he performs more farm work or household chores such as laundry or cleaning, which Cindy can no longer perform. He catheterizes her again before he goes to bed, and may also stimulate another bowel movement at that time.

{¶ 11} Cindy and Rau both testified that the care provided by Rau is necessary, and that they fear Cindy would have to move to a nursing home if she could no longer receive that level of care. As for their living arrangements, Rau testified he built ramps and added the basement shower stall to make their home more accessible for Cindy, but that he does not believe the house can practically accommodate other items such as an elevator or first-floor shower, and he noted that he served as the general

contractor for the original construction of the home. He related that instead of attempting any other modifications to the existing home, he and Cindy would like to build a handicapped accessible home on the farm property. Cindy testified that she would also like to have a vehicle equipped for the mobility-impaired so that she could more easily leave the house and regain some independence. She stated that she and Rau currently leave the house for church every week, for doctor's appointments, and for an occasional meal at a restaurant, but that she and Rau no longer dine out or travel to the degree they would like.

{¶ 12} Plaintiffs offered expert testimony, by way of deposition, from Carolyn Miller, M.D., a board-certified neurosurgeon practicing at the Ohio State University Medical Center. Dr. Miller reviewed Cindy's medical records and saw her for an examination. Dr. Miller testified that as a result of the spinal cord injury, Cindy has tetraparesis, or weakness in all four limbs, most pronounced in her legs, including no function at all in the right foot; reduced grip strength and some lack of sensory ability in both hands; muscle spasms in her legs; inability to empty her bladder without a catheter and urine leakage when the bladder becomes filled; and, inability to pass stool without digital stimulation of the bowel. According to Dr. Miller, Cindy's injuries are probably permanent and she will thus never be able to functionally ambulate for the rest of her life, and she will require a caregiver for the rest of her life to assist with tasks such as catheterizing, changing of diapers and sanitizing after bladder, bowel stimulation and occasional extraction of hard stool, and therapeutic exercises. Dr. Miller testified that Cindy should not be left alone for more than a few hours at a time, and that she needs to have someone available to respond quickly when she has bowel or bladder issues, particularly because staying sanitary is key to avoiding infections and skin breakdown. Dr. Miller opined that Cindy's life expectancy is dependent upon the level of care she receives, and that if she is properly cared for she should have a normal life expectancy.

{¶ 13} Defendants offered expert testimony, by way of deposition, from Jeffrey Strakowski, M.D., a physician at Riverside Methodist Hospital in Columbus who is board-certified in physical medicine and rehabilitation. (Defendants' Exhibit N.) Dr. Strakowski, who reviewed Cindy's medical records and performed an independent medical evaluation of her, testified that her spinal cord injury resulted in an assymetric

incomplete tetraparesis, meaning that she has incomplete motor function in all four limbs, and that she also has incomplete bowel and bladder function. He related that his examination demonstrated that Cindy has some weakness in her hands, but that they remain substantially functional; that she has right leg strength of 2 or 3 on a scale of 5, as opposed to Dr. Miller's finding of 0/5 strength; that she has left leg strength of 3 or 4 on a scale of 5; and, that she has thoracic back pain and loss of sexual function.

{¶ 14} Dr. Strakowski testified that Cindy requires a caregiver to assist her in passing urine and stool, and in transferring to and from her wheelchair. Concerning the need for assistance in emptying the bladder, Dr. Strakowski explained that it is important to keep Cindy from soiling herself so that she does not develop a skin infection. Dr. Strakowski acknowledged that the therapeutic walking that Cindy engages in while wearing her foot and ankle brace is beneficial for both exercising the lower limbs and avoiding osteoporosis. In Dr. Strakowski's opinion, Cindy needs a caregiver to perform much of the same kind of assistance that Rau now provides, particularly in regard to the bowel and bladder issues and transferring to and from the wheelchair.

{¶ 15} Defendants also presented expert testimony from Michael Yaffe, M.D., who is board-certified in internal medicine and practices in Columbus at the McConnell Heart Hospital and the Ohio State University Medical Center. Based upon his review of Cindy's medical records, Dr. Yaffe opined that Cindy has less than a normal life expectancy as a result of co-morbid conditions, specifically hypertension and diabetes. He explained that hypertension causes both hypertrophy of the heart muscle and renal dysfunction, and that Cindy has exhibited a manifestation of hypertrophy inasmuch as she suffered a flash-pulmonary edema, and has also exhibited symptoms of kidney disease. He further explained that diabetes may cause damage to organs, especially the heart, and that most diabetes patients do not reach normal life-expectancy even if their blood sugar is well-controlled. He acknowledged, though, that Cindy takes hypertension medication and that her diabetes has been under control for several years.

{¶ 16} Plaintiffs and defendants both offered testimony from professional life care planners regarding the costs associated with Cindy's care and well-being. William Burke, Ph.D., a rehabilitation counselor who develops long-term plans of care for the

disabled and performs vocational assessments, testified for plaintiffs. Burke developed a life care plan for Cindy based upon his review of her medical records, as well evaluations that he performed at her home in 2008 and by telephone in 2011. (Plaintiffs' Exhibit 9A.) Burke's plan places the cost of Cindy's medical care, medication, medical supplies and equipment, orthotics, therapy, mobility and transportation equipment, and support services (e.g. a live-in personal care attendant) at $89,637 annually for the remainder of her life. Burke's plan does not include the cost of architectural renovations to the existing home or construction of a wheelchair-accessible new home, but he has been to plaintiffs' home and found that it lacked appropriate accommodations for Cindy's needs. Burke testified that he coordinates with contractors and architects to modify and build homes, and that he believes $75,000 is a reasonable cost estimate for making the appropriate accommodations in a new home. Burke also opined that as a result of her injuries, Cindy can no longer perform the type of labor that she once performed on the farm.

{¶ 17} The most significant areas of disagreement between the life care planners who testified in this case concerns the amount of time that a caregiver will be present and the compensation of that caregiver. To that end, Burke testified that his recommendation is for Cindy to have what Rau essentially now serves as, a live-in caregiver who would be available at all times, but could leave the home for short periods. Burke stated that the caregiver is needed to perform essentially the same work that Rau is currently doing, although he acknowledged that Cindy might be able to perform some meal preparation in a handicapped-accessible kitchen.

{¶ 18} He explained that the primary caregiver would work 260 days a year, and a back-up caregiver would work 134 days a year while the primary is off-duty. Burke concluded in his report that in order to hire a quality, trustworthy individual to serve in this role, which entails the sensitive quasi-medical duties described earlier, an hourly wage of $12 is appropriate. He stated that the plan offered by defendants' life care planner, which provides for 40 hours of care per week, is impractical in that it is difficult to find someone to work that amount of hours spread across seven days a week, that hiring an agency to provide this care would not be cost-effective, that the plan does not

allow time for the caregiver to buy groceries or run other errands, and that it would not allow Cindy to remain at home if Rau were no longer able to care for her.

{¶ 19} Defendants presented the testimony of Dorene Spak, a rehabilitation counselor who prepares lifecare plans and performs vocational assessments. Based upon her review of Cindy's medical records, Spak prepared a life care plan. (Defendants' Exhibit K.) She testified that her plan has much in common with Burke's, but she noted some differences such as her recommendations of a dietician, a knee/foot orthotic in place of the ankle/foot orthotic that Cindy currently uses, occasional psychological counseling for Cindy's depression rather than the ongoing counseling recommended by Burke, and, most significantly, her recommendation of part-time rather than full-time care.

{¶ 20} Regarding that level of care, Spak stated that Cindy needs assistance with her bowel and bladder issues, transferring to and from the wheelchair, therapeutic ambulation, and performing household chores, and that this all amounts to less than six hours of work per day; she explained that the weekly 40 hours of care called for in her plan can be allocated throughout the week as needed. She acknowledged that the need for care can arise at any time, that her plan leaves Cindy without a caregiver other than Rau most of the time, and that she is unsure how long Cindy could live on her own if Rau were no longer able to care for her. According to Spak, figures published by the United States Bureau of Labor Statistics show that a home health aide in southern Ohio earns an average $9.57 per hour, and in her opinion, this is a reasonable wage for the caregiver contemplated in her plan.

{¶ 21} Lastly, plaintiffs offered the deposition testimony of David Boyd, Ph.D., an economist at Denison University. Boyd testified that, based upon generally accepted economic principles and methodologies, the life care plan prepared by Burke has a present-day value of $2,452,277, assuming that Cindy enjoys the normal life expectancy for a Caucasian woman her age, as established by the Bureau of Labor Statistics, being 82.7 years. Boyd further testified as to Cindy's lost earning capacity for her work at the family farm, explaining that he used the standard methodology for individuals such as Cindy who are not paid a wage for their work. He stated that if Cindy worked 10 hours per day, 5 days per week, prior to her injury, as related in

Burke's life care plan, for 50 weeks per year until age 67, and if the value of such work is equivalent to the Bureau of Labor Statistics' average hourly wage of $10.43 for workers and laborers at Ohio farms, nurseries, and greenhouses, then the estimated present value of her pre-injury earning capacity is $471,031.30. He stated that if after her injury, Cindy now works an average of 4.5 hours per day, 5 days per week, for 50 weeks per year until age 67, at the same $10.43 hourly wage, the estimated present value of her post-injury earning capacity is $186,571.57. Finally, he stated that if Cindy's post-injury earning capacity is subtracted from her pre-injury earning capacity, this results in a total lost earning capacity of $284,459.73.

{¶ 22} Upon review of the evidence adduced at trial, the court finds that the life care plan prepared by Burke more accurately reflects the care that Cindy requires in order to lead a quality life than does the plan prepared by Spak. Drs. Miller and Strakowski offered substantially similar descriptions of the nature, extent, and permanency of Cindy's injuries. The life care plans offered by Burke and Spak have much in common as well, differing most significantly in terms of the hours and wages associated with the caregiver that each of them agrees is needed. The court finds that the type of care that Cindy needs is essentially the care that Rau currently provides, including several bladder catheterizations daily, cleanup and sanitization of bladder accidents at any time of the day, bowel stimulations once or twice daily, therapeutic exercise, massaging of leg spasms at any time of the day, attiring, placement of the right ankle brace, transfers to and from the wheelchair, and various household tasks. The need for such care is spread throughout the day, can arise at anytime, and requires that someone be available to quickly respond at all times. The importance of minimizing the exposure of urine to Cindy's skin is undisputed; under Rau's care, she has not been forced to remain in urine-soaked diapers or bedsheets, and she should not have to do so if he were no longer around.

{¶ 23} Although defendants argue that Burke's opinion on an appropriate wage for the caregiver is inadmissible because Burke stated that he relied in part upon data furnished by the Mid-Ohio Independent Living Center, which was not admitted into evidence, his opinion is indeed admissible in that it is based upon his perception that $12.00 an hour is reasonable. *See* Evid.R. 703; R.C. 2317.36. Further, Burke and

Spak both used similar methodology in gathering data for the preparation of their reports.

{¶ 24} Boyd's testimony establishes that the present value of the life care plan developed by Burke is $89,637 annually for the remainder of Cindy's life. The court finds that plaintiffs have demonstrated that the most reasonable estimate of Cindy's life expectancy is the Bureau of Labor Statistics' figure of 82.7 years. Dr. Miller credibly stated that if Cindy continues to receive appropriate care, she should have a normal life expectancy, and the court finds Dr. Miller's opinion on this issue to be more persuasive than Dr. Yaffe's. Thus, as set forth in Boyd's calculations, the present value of Cindy's life care plan for the period from 2011 to 2038 is $2,452,277.11. (Plaintiffs' Exhibit 11.)

{¶ 25} Related to the life care plan, the court also finds that plaintiffs are entitled to damages in the amount of $75,000 for the cost of either incorporating handicapped accessible features into the construction of a new home or modifying their existing home. Burke testified that this was a reasonable figure for such work, based upon his experience working with contractors to perform this type of work, and the court finds his testimony to be credible.

{¶ 26} It is clear that Cindy's injuries will prevent her from ever performing the type of farm work that she once performed, and she will be limited to the type of customer service role that she now fulfills in the farm market. Based upon the totality of the evidence, the court finds that Cindy has a reduced earning capacity as a result of her injury, and based upon Boyd's calculations, the value of her resultant lost income is $284,459.73. Moreover, the court finds that plaintiffs are each entitled to damages for pain and suffering in the amount of $250,000.

{¶ 27} The court notes that at the time of trial, the parties contemplated that any award of damages would be reduced, pursuant to R.C. 3345.40(B)(2), by the amount of a settlement that plaintiffs reached with Clinton Memorial Hospital. R.C. 3345.40(B)(2) provides that any award against a state university or college shall be reduced by the amount of "benefits" a plaintiff receives or is entitled to receive "for injuries or loss allegedly incurred from a policy or policies of insurance or any other source * * *." However, in a recent decision, the Tenth District Court of Appeals determined that the word "benefits," as it appears in R.C. 3345.40(B)(2), refers to "'[f]inancial assistance

received in time of sickness, disability, unemployment, etc., either from insurance or public programs, such as social security.'" *See Aubry v. Univ. of Toledo Med. Ctr.*, 10th Dist. No. 11AP-509, 2012-Ohio-1313, ¶22, quoting *Black's Law Dictionary* 158 (6th Ed.1990). In the instant case, inasmuch as plaintiffs' settlement with Clinton Memorial Hospital does not constitute a benefit under the definition set forth in *Aubry*, the court concludes that the statute does not operate to reduce plaintiffs' award by the amount of that settlement.

{¶ 28} In light of the foregoing, the court finds that plaintiffs are entitled to recover total damages in the amount of $3,311,761.84, which includes the $25 filing fee paid by plaintiffs. Accordingly, judgment shall be entered in that amount.



# Court of Claims of Ohio

CYNTHIA A. ADAE, et al.

    Plaintiffs

    v.

UNIVERSITY OF CINCINNATI, et al.

    Defendants

Case No. 2007-08228

Judge Alan C. Travis

<u>JUDGMENT ENTRY</u>

{¶ 29} This case was tried to the court on the issue of plaintiffs' damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiffs in the amount of $3,311,761.84, which includes the $25 filing fee paid by plaintiffs. Court costs are assessed against defendants. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
ALAN C. TRAVIS
Judge

cc:

Anne B. Strait
Naomi H. Maletz
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130


Michael R. Thomas
4 Sycamore Creek Drive
Springboro, Ohio 45066

Kenneth S. Blumenthal
Michael J. Rourke
495 South High Street, Suite 450
Columbus, Ohio 43215

001
Filed April 6, 2012
To S.C. reporter August 24, 2012